ORIGINAL

1

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2
            CIVIL ACTION NO. 1:11-cv-00054-LG-RHW
 3

 4   DAVID MARQUAR                            PLAINTIFF

 5   VS.

 6   OFFICER CHRIS ALLEN, individually and in
     his official capacity as a duly
 7   commissioned Police Officer for the City
     of Waveland, MS; POLICE CHIEF JAMES A.
 8   VARNELL, individually and in his official
     capacity as a duly commissioned Police
 9   Officer for the City of Waveland, MS;
     DAVID GARCIA, individually and in his
10   official capacity as Mayor of The City of
     Waveland, MS; CITY OF WAVELAND, UNKNOWN
11   JOHN AND JANE DOES A - Z          DEFENDANTS

12   ─────────────────────────────────────────

          DEPOSITION OF DAVID KEITH MARQUAR
13   ─────────────────────────────────────────

14        Taken at Phelps Dunbar, LLP, NorthCourt One,
     Suite 300, 2304 19th Street, Gulfport,
15   Mississippi, on June 21, 2012, beginning at
     2:31 p.m.
16

17   REPRESENTING THE PLAINTIFF:
          BOBBY MOAK, ESQUIRE
18        402 Monticello Street
          Bogue Chitto, MS  39629
19        bmoak@locnet.net

20   REPRESENTING THE DEFENDANTS:
          WILLIAM BRETT HARVEY, ESQUIRE
21        Phelps Dunbar, LLP
          4270 I-55 North
22        Jackson, MS  39201
          harveyb@phelps.com

23              REPORTED BY:
          Elizabeth Bost Simpson, CSR 1293
24             2100 18th Street
          Gulfport, Mississippi  39501
25        ESimpson@SBMreporting.com
```

EXHIBIT

tabbies

1

```
1              THE WITNESS:  Bobby, I don't want to
2         argue.
3              MR. MOAK:  Just --
4         A.    But I did not, I have not, paid one
5    penny on one of these fines.
6    BY MR. HARVEY:
7         Q.    Okay.
8         A.    Every police -- just about every police,
9    the chief, the mayor, my neighbor is a police, and
10   not one time has anyone came and said, David, you
11   owe this.
12        Q.    Okay.  Did you ever file an appeal of
13   this conviction of resisting arrest or disturbing
14   the peace?
15        A.    No, sir.
16        Q.    Okay.  So you never sought to have it
17   overturned; is that right?
18        A.    Didn't have to.
19        Q.    Okay.  Well, that's your opinion; right?
20        A.    (Nodding head affirmatively).
21        Q.    I'm just asking you factual questions.
22        A.    Yes, sir.  Yes, sir.  And I'm being
23   truthful, like you asked me to.
24        Q.    Let's be fair.  I understand.  I'm not
25   asking for your legal opinion, so you don't have
```

1    to give it to me.  But you've never filed an

2    appeal; right?

3         A.   No, sir.

4         Q.   You've never tried to have your record

5    expunged; right?

6         A.   What do you mean?

7         Q.   Well, that's -- if you don't know what

8    it means, then you probably didn't do it.

9         A.   Okay.

10        Q.   Okay.  As far as you know, you didn't

11   try to have your record expunged; is that right?

12        A.   Whatever "expunged" means.

13        Q.   That's fine.  Well, as far as you know,

14   you didn't do anything to make a guilty verdict go

15   away, be overturned, be vacated; is that right?

16        A.   Right.

17        Q.   Okay.  Fair enough.  You don't dispute

18   that you were charged with resisting arrest and

19   disturbing the peace, do you?

20        A.   Yes.

21        Q.   You dispute that you were charged with

22   that?

23        A.   Yes.

24        Q.   Why do you dispute that?

25        A.   First of all, disturbing the peace, I

 1   us.   The night of my court that my attorney was

 2   with me, the judge would not make a ruling.

 3       Q.   Okay.   Did you know whether the judge

 4   made a ruling later?

 5       A.   No.

 6       Q.   You just don't know one way or the

 7   other, do you?

 8       A.   Except reading the newspaper.

 9       Q.   Okay.   But other than reading hearsay in

10   the newspaper, which can be wrong, you don't know

11   what the judge ultimately held, do you?

12       A.   No, sir.

13       Q.   Okay.   Fair enough.   These charges of

14   resisting arrest and disturbing the peace, they

15   stemmed from the events that night when you got

16   tased, don't they?

17       A.   Yes, sir.

18       Q.   Right.   So I'm not asking you to agree

19   that they have merit or anything.   I'm just asking

20   you agree that the charges came from the events at

21   the Superbowl party where you got tased as opposed

22   to some other event; right?

23       A.   Yes.

24       Q.   Okay.   Good.

25            MR. HARVEY:   Let's mark this as Exhibit

1    Q.   I don't know how to pronounce it, but
2  it's --
3    A.   Mauffray.
4    Q.   Mauffray?
5    A.   Yes, sir.
6    Q.   And did he indicate to you that you
7  needed to file a lawsuit in this case?
8    A.   That night?
9    Q.   Right.
10   A.   No, sir.
11   Q.   Did he say anything to you that night?
12   A.   I didn't even see him.
13   Q.   Okay.  Fair enough.  All right.  Well,
14  with that, then, let's talk about how the incident
15  occurred on the night of February 7th, 2010.
16  First of all, just to make sure we're on the same
17  page, you agree with me that your tasing and
18  arrest occurred at the Superbowl party on
19  February 7, 2010; right?
20   A.   Right.
21   Q.   And it was somewhere around 7:00 or 7:30
22  in the evening; right?
23   A.   Yes.
24   Q.   Tell me how this party was set up.  In
25  other words, tell me the layout of it.  Was it all

1   on your property?  Was it on someone else's

2   property?  How did that work?

3        A.   Okay.  I know you said be short, but I'm

4   going to be truthful.  What it was, we started

5   that morning -- we started the day before getting

6   everything ready and everything for the party.

7        Q.   Okay.

8        A.   We had the party.  We planned it in my

9   poolhouse.  Had about 25 people.  My son, who

10  lives over from me, he planned his.  We cooked all

11  kinds of food.  And when the game came on, we all

12  sat down and started watching it.

13       Q.   Okay.

14       A.   It was on my property at 1100 Longo

15  Street.  There was no complaints of nothing there.

16       Q.   Well, okay.  And is 1100 Longo Street

17  adjacent to 600 Turner Street?

18       A.   The way the land is, yes, it would be.

19       Q.   In other words, the two properties touch

20  each other?

21       A.   Yes.

22       Q.   And 600 Turner Street is your son's

23  address?

24       A.   Yes.

25       Q.   And is that Kendall?

34

1        A.    Yes.

2        Q.    Are there any fences or gates or

3   anything between them?

4        A.    There's a fencepost right at the corner

5   of my land with a shed.

6        Q.    With a what?

7        A.    With a little woodshed that my neighbor

8   has, my other neighbor has.

9        Q.    All right.  Now, you own the poolhouse;

10   is that right?

11        A.    Yes, sir, that's right.

12        Q.    How many people did y'all invite to your

13   party?

14        A.    I'm going to say 25 was there, but you

15   have that --

16        Q.    I was going to say, how many people

17   showed up?

18        A.    I would say close to the whole 25, you

19   know.  At certain times they were going from my

20   son's to, you know, the poolhouse.

21        Q.    Well, how many people would you say, if

22   you had to estimate, were at -- the two parties

23   combined, how many people total were at the two

24   parties combined?

25        A.    I'd say 40.

38

```
 1        A.    Cans of beer and fifths of whiskey.

 2        Q.    Okay.

 3        A.    If they wanted to drink.

 4        Q.    Okay.  Now, what had you had to drink

 5   that day?

 6        A.    Crown and Diet Coke.

 7        Q.    Crown and Coke?

 8        A.    That night, Crown and Diet Coke.

 9        Q.    How many?

10        A.    Diet Coke.

11        Q.    How many?

12        A.    Let's say six.  It started at 6:00.  The

13   game started at 7:00.  I'd say four.

14        Q.    Four Crown and Cokes?

15        A.    Yes, sir.

16        Q.    Since the game started?

17        A.    Yes, sir.

18        Q.    That's impressive.

19              MR. MOAK:  Object.

20   BY MR. HARVEY:

21        Q.    Did you observe other people drinking at

22   the party?

23        A.    No, sir, not while the game was on.

24        Q.    Okay.  Well, at any point did you

25   observe anyone else drinking at the party?
```

1      Q.    Sure.

2      A.    At that time he told me, he said, Hey,

3  you're going to have to keep the noise down.  I

4  said, I'm telling you again -- and before I could

5  say anything, my wife walked up and said, Hey, we

6  didn't know you're a police.  You have stripes on

7  your pants and you have a gun on.  Now, what do

8  you want?  He said, Y'all are making too much

9  noise.

10      Q.    Is it a good idea to ask a police

11  officer what they want?

12      A.    What do you mean, ask him what he wants?

13  I didn't ask him what he wants.

14      Q.    Is that a courteous way to speak to a

15  police officer?

16      A.    I don't follow what you mean.

17      Q.    Fair enough.  So at that point after the

18  Saints had made a first down, you had become aware

19  that Chris Allen is a police officer; is that

20  right?

21      A.    My wife, by my wife.

22      Q.    Okay.  But you knew it at that point;

23  right?

24      A.    Right.  Then, yes.

25      Q.    Okay.  Then what happened?

1      A.    Then my wife said, Okay.  I have it
2 under control.  You can leave.
3      Q.    Okay.
4      A.    He walked out of my poolhouse door.  I
5 don't know where he went.  My wife said, Okay.
6 We'll turn it down and be quiet.  I said, Why?
7 We're not making no noise.  I walked out of my
8 door, walked into my poolhouse.  I went back
9 inside and we were sitting there.
10     Q.    Let's slow down a little bit.  You're
11 going pretty fast.  So your wife tells Officer
12 Allen that you've got things under control.
13     A.    She does.
14     Q.    That she's got things under control.
15     A.    We'll turn the noise down, that he could
16 leave.
17     Q.    And she says we'll turn the noise down
18 and that he could leave?
19     A.    Right.
20     Q.    Okay.  And he goes out of the poolhouse.
21     A.    Right.
22     Q.    And you don't know where he went at that
23 point.
24     A.    No, sir.
25     Q.    Okay.  Now, at that point, what did you

47

1   do?

2       A.    I walked out of my poolhouse and my

3   wife -- me and my wife was talking.  It was

4   halftime.

5       Q.    Why did you walk out of your poolhouse?

6       A.    Because I was going to go inside my

7   house and watch the rest of the game because I

8   couldn't sit there and enjoy it because I can't

9   hear very well and I've got to turn it up to hear.

10   And she said, Well, come on.  We'll turn it up

11   just a little bit.  He left.  I went back

12   inside --

13       Q.    Okay.  So just to be clear, at this

14   point you walked outside of your poolhouse and you

15   told your wife that you were going to just go in

16   the house because you wanted to be able to hear

17   the game; is that right?

18       A.    That's right.

19       Q.    And your wife said, Well, let's just

20   turn the game up here in the poolhouse because the

21   police are gone.  Is that right?

22       A.    Right.

23       Q.    So she actually suggested doing the

24   opposite of what she told the police she would do.

25       A.    She had turned it up loud enough where I

1  could hear.

2      Q.   Right.  After telling the police that

3  she would turn it down.

4      A.   And we were going -- we did turn it

5  down.

6      Q.   But then you turned it back up.

7      A.   No, we did not.

8      Q.   I'm just trying to understand.  My

9  understanding is you had turned it down after --

10  well, you tell me.

11      A.   He wasn't complaining about the TV.

12      Q.   Okay.

13      A.   He was complaining about the noise.

14      Q.   Okay.  I see.  So your wife never told

15  him that she would turn the TV down.

16      A.   She told him she had it under control.

17  She'd keep everybody down.

18      Q.   In other words, she'd just keep the

19  noise down generally.

20      A.   Right.

21      Q.   So you guys, after he has walked out of

22  the poolhouse, you walk out of the poolhouse with

23  your wife; is that right?

24      A.   Right.

25      Q.   Where specifically outside the

1   poolhouse?  I mean, how far outside the door?

2      A.   Three feet.

3      Q.   Thirty feet?

4      A.   Three feet.

5      Q.   Three feet.  So obviously still on your

6   property.

7      A.   Yes.

8      Q.   Okay.  And you say you want to go in the

9   house and she says, Well, no.  Stay out here.

10  We'll turn the volume up on the TV.

11      A.   No.  She didn't say turn the volume up.

12  She said we'll keep everything quiet where you can

13  hear.

14      Q.   We'll keep everything quiet where you

15  can hear.  Okay.  I appreciate that.  I appreciate

16  that.  And then what happened?

17      A.   And then when I got back in, I sat down.

18  We started watching TV.  Halftime was coming on.

19  I went to the bathroom, to the back of my

20  poolhouse.  I went to the bathroom.  When I came

21  back, I turned around and looked.  My door swung

22  open.  It was bang.

23      Q.   The door to the poolhouse swung open?

24      A.   Swung open.  He shot me.  No questions

25  asked or nothing.

1     Q.    So you're claiming that you were coming

2  out of the bathroom?

3     A.    That's right.

4     Q.    And a police officer, without

5  provocation, just opened the door and shot you

6  with a TASER for no reason?

7     A.    Right.

8     Q.    So I want to make sure we're clear on

9  this.  You're --

10     A.    Right.

11     Q.    Hold on.  Your testimony is that you did

12  not resist arrest in any way; is that right?

13     A.    Right.

14     Q.    Good.

15     A.    And P.J. Murphy is a witness.  He was

16  standing outside when he saw it all.

17     Q.    Hold on because I want to get this.

18  Your testimony is that you did not resist

19  verbally; is that right?

20     A.    Right.

21     Q.    You did not resist physically?

22     A.    Right.

23     Q.    You did not resist in any way; is that

24  right?

25     A.    Right.

1      Q.    Okay.  Good.

2            MR. HARVEY:  Let's go off the record for

3      a second.

4            OFF RECORD)

5  BY MR. HARVEY:

6      Q.    Okay.  I just want to lay out a few

7  points about just what your version of events is.

8  You just said that you did not resist verbally or

9  physically; correct?

10     A.    No, sir.

11     Q.    At any point during this whole

12 altercation; right?

13     A.    No, sir.

14     Q.    So it was not a situation where you

15 might have resisted a little at some point either

16 before or after the tasing.  You're saying from

17 the beginning of the Superbowl party to the time

18 you went to the hospital, you never resisted

19 arrest; right?

20     A.    No, sir.

21     Q.    Not once.

22     A.    No, sir.

23     Q.    Is that right?  Am I -- in other

24 words --

25     A.    You are correct.  I never resisted

1   arrest; never was told I was under arrest.

2       Q.   Not verbally?

3       A.   No, sir.

4       Q.   And not physically?

5       A.   No, sir.  Well, physically is when he

6   put the handcuffs on me, apparently.

7       Q.   But you didn't resist when he put the

8   handcuffs on you, did you?

9       A.   I was knocked out.

10      Q.   Okay.

11      A.   I was out cold as a wedge.

12      Q.   I just wanted to make sure that I

13  understand.  I appreciate that.

14           Okay.  So let's recap what just

15  happened.  You say you had gone to the bathroom

16  during halftime; is that right?

17      A.   Right.

18      Q.   And you stepped out of the door to the

19  bathroom.

20      A.   No.  No.  From my bathroom to where I

21  sit is probably ten, maybe 15 feet.

22      Q.   Okay.

23      A.   I come out the bathroom.  You've got to

24  pass my door to get back to the bar.  When I came

25  out, when I got to the door, to my door, I was

56

1    know if anybody was talking to him?

2        A.    Not that I know of, no, sir.

3        Q.    Do you know one way or the other?

4        A.    No, sir.

5        Q.    So you wouldn't know if someone had been

6    say, yelling or heckling or threatening him, would

7    you?

8        A.    No, sir.

9        Q.    But your contention is that you didn't

10    say anything like that.

11        A.    No, sir.

12        Q.    And to be clear, your contention is that

13    you did not step outside the poolhouse just before

14    being tased; is that right?

15        A.    Correct.

16        Q.    And did he try to grab you with his hand

17    or restrain you in any way before he tased you?

18        A.    No, sir, he did not.

19        Q.    Therefore, did you pull away from him

20    before he tased you?

21        A.    No, sir, I did not.

22        Q.    Okay.  So at this point you're saying

23    that you have been hit with the TASER and you feel

24    like you're sort of knocked out; right?

25        A.    I don't feel like it.  I was.

1     Q.    Okay.

2     A.    I didn't know nothing until I got in the

3  ambulance.

4     Q.    That's fine.  So you don't remember

5  anything between that time and when you got in the

6  ambulance?

7     A.    That's right.

8     Q.    So I could sit here and ask you about

9  moving you across the yards and over to the

10  ambulance in the parking lot and you just wouldn't

11  know anything about it; right?

12     A.    Truthfully, right.

13     Q.    And when we get to trial you still won't

14  know anything about it?

15     A.    Not unless I lie and I won't do that.

16     Q.    Okay.  Good.  Well, if you don't know

17  anything about what happened after that, I'm not

18  going to ask you about it.

19     A.    No, sir.

20     Q.    Who, remind me, is Joseph Dedeaux?

21     A.    That was a friend -- well, he's a family

22  friend, plus he was Chris' friend.

23     Q.    How is he a family friend?  How does

24  your family know him?

25     A.    We've been knowing the Dedeauxes.  You

61

1    other?

2        A.   No, sir.  Only thing I said, excuse the

3    language, is get your ass out of my poolhouse.

4        Q.   Okay.

5        A.   For you and Joey to bring y'all's asses

6    back over to Kendall's.

7        Q.   Okay.  Fair enough.  And forgive my

8    language, but did you say get the fuck off of my

9    property?

10       A.   No, sir, I did not.

11       Q.   Okay.  Do you recall being told you were

12   under arrest?

13       A.   No, sir, never was.

14       Q.   Okay.

15       A.   As long -- up until I was tased, I was

16   never told I was under arrest.  After I was tased

17   until I got in the ambulance, they could have told

18   me anything.

19       Q.   Well, okay.  I tell you what:  You said

20   you didn't remember anything until you got into

21   the ambulance.  Tell me what you remember -- next

22   thing that you remember when you got in the

23   ambulance.

24       A.   I got in the ambulance and Officer

25   Necaise, I asked him if he would ride with me,

1        A.    No, sir.

2        Q.    Okay.  How clear is your memory of the

3    time at the hospital?  Were you completely lucid

4    or were things still kind of fuzzy?

5        A.    I was, I guess, feeling better when I

6    got the shot.

7        Q.    Well, would you say that your memory of

8    that time is as clear as your memory is generally,

9    or is it still a little fuzzier than normal?

10       A.    I'd probably say it's clear.

11       Q.    Okay.  Did you ever say to anybody in

12   the hospital that you were okay?  You just wanted

13   a Crown and Coke?

14       A.    Yes, I did.

15       Q.    Okay.  Fair enough.  And do you remember

16   standing up when the Saints got that last

17   interception and dancing and yelling, Who Dat?

18       A.    Yes, sir, I did.

19       Q.    Okay.

20             MR. HARVEY:  Mark this as Exhibit 6.

21                      - - -

22             (Exhibit Number 6 marked)

23   BY MR. HARVEY:

24       Q.    If you'll look at the upper right-hand

25   corner, the date is February 7, 2010, and it is,

94

1    that you mention in the lawsuit is the idea of

2    equal protection.  Equal protection generally

3    refers to the government not discriminating on the

4    basis of things like race and age and sex and

5    things like that.  You understand?

6        A.    (Nodding head affirmatively).

7        Q.    Do you contend that you were tased

8    because of any protected status you have, like

9    your age or your race, or was it just because an

10   officer was too eager to use his TASER?

11       A.    Too eager to use his TASER.

12       Q.    Okay.  So it wasn't because of any kind

13   of discrimination, was it?

14       A.    No.

15       Q.    Your complaint also mentions due

16   process.  Were you ever actually taken to the

17   station and booked?

18       A.    No, sir.

19       Q.    Were you ever actually placed in a cell?

20       A.    No, sir.

21       Q.    Do you contend that the city of Waveland

22   or any of the defendants did anything wrong in the

23   way that they processed your case after the events

24   occurred?  In other words, I understand you

25   disagree with the tasing, but do you think that

1    the officers or the prosecutor or anyone violated

2    any procedural rules in how they handled your

3    case?

4         A.    I still don't understand what you're

5    getting to.

6         Q.    Well, can you point to any point in your

7    case where you think, other than the tasing itself

8    and taking you to the hospital and all that, where

9    Waveland did something wrong in how it processed

10   your case?

11        A.    Well, I guess not.  Now, well, after --

12   well, they -- I guess they could have been

13   trained.

14        Q.    What's that?

15        A.    They could have been trained how to use

16   the gun.

17        Q.    And we'll talk about that in a second.

18   I'm just asking the procedural handling of your

19   case and your prosecution, did they do anything

20   wrong in that phase of handling your case that you

21   know of?

22        A.    Yeah.  They could have been man enough

23   to come to my house and tell me I was charged.

24        Q.    Okay.  Other than that, did they do

25   anything wrong in how they handled the procedures

1    in your case?

2        A.    No, sir.

3        Q.    Okay.  If you'll look at paragraph 27,

4    and really it's all throughout the complaint, you

5    mention the policies and the procedures of the

6    City of Waveland.

7        A.    Yes, sir.

8        Q.    Okay.  Do you know what the policies of

9    the City of Waveland are with respect to using

10   TASERs?

11       A.    No, sir.

12       Q.    And do you know who sets the policy for

13   the City of Waveland on using TASERs?

14       A.    No, sir.

15       Q.    If you'll flip over, Count II is on page

16   10, and it talks about a conspiracy to interfere

17   with civil rights.  Do you see that?

18       A.    Uh-huh.

19       Q.    What evidence do you have that anyone at

20   the Waveland Police Department ever conspired

21   together to harm you?

22       A.    Because they had no right in my house.

23   They had no right on my property.  They had no

24   rights on my house.  There was no complaint at my

25   house.  There was -- on and on.  The thing boils

97

1    down to he had no reason on my property.

2        Q.    Do you understand what I mean when I say

3    "conspiracy"?  Let me just tell you.  A conspiracy

4    generally is when more than one person gets

5    together and communicates or agrees to do

6    something to someone else.  You understand?  Now,

7    I know you contend that Officer Allen shouldn't

8    have been on your property.  That's not my

9    question.  My question is what evidence do you

10   have that people at the City of Waveland, other

11   than Officer Allen, got together and conspired or

12   communicated in an effort to harm you?

13       A.    None.

14       Q.    Okay.  And then on a related point, if

15   you'll just flip over on Count III, it's on page

16   12.  It says, Action for neglect or failure to

17   prevent conspiracy.  Do you see that?

18       A.    Uh-huh.

19       Q.    And it talks about James Varnell.  You

20   know, he's the police chief; right?

21       A.    Right.

22       Q.    Or he was, at least.  Do you know

23   whether James Varnell knew of any conspiracy

24   against you?

25       A.    I don't know.

1    look at A, it says battery.  Battery means causing

2    an offensive contact with somebody's person.  I

3    just want to make sure I understand.  Earlier you

4    said your version is that you never resisted

5    arrest verbally or physically at any point; right?

6        A.   Right.

7        Q.   Okay.  And to be clear, you're not

8    contending that you were resisting at one point

9    and then stopped, are you?

10       A.   No, sir.

11       Q.   You're saying you never did it at all.

12       A.   No, sir, never did.

13       Q.   Okay.  Let's flip over to page 18.  Look

14   at E, negligent and intentional infliction of

15   emotional distress.  What evidence do you have

16   that Officer Allen intended to cause you emotional

17   distress?

18       A.   Because he shot me.  He tased me for no

19   reason.

20       Q.   Okay.  So other than firing the TASER,

21   what evidence do you have that he intended to

22   cause you emotional distress?

23       A.   None.

24       Q.   Look over on page 19 --

25       A.   Yes, sir.

1    A.    Yes.

2    Q.    Okay.  It's talk about some of the

3 individual defendants that you've named.

4 Obviously I understand what your claim is against

5 Chris Allen.  What did James Varnell do to harm

6 you?

7    A.    What did he do to harm me?

8    Q.    Right.

9    A.    Well, I feel like being the chief of

10 police, he could have came and, you know, looked

11 into the case to try and find out what happened

12 and everything.

13    Q.    Did you ever file a complaint with Chief

14 Varnell?

15    A.    No.

16    Q.    Okay.  Do you know what, if any,

17 internal investigation or discussions took place

18 regarding your tasing?

19    A.    No.

20    Q.    Okay.  And was James Varnell present at

21 the scene when you were tased?

22    A.    No.

23    Q.    Do you know who David Garcia is?

24    A.    Yes.

25    Q.    Who is he?

1      A.    The mayor of Waveland.

2      Q.    Was he the mayor of Waveland when you

3  were tased?

4      A.    No, sir.

5      Q.    Has he done anything to harm you?

6      A.    No, sir.

7            MR. HARVEY:  That is all I have.

8            THE WITNESS:  Raised my taxes.

9            MR. HARVEY:  Well --

10           MR. MOAK:  Let me ask a few real quick.

11                      - - -

12                   EXAMINATION

13  BY MR. MOAK:

14      Q.    Let's go back to his Exhibit 5.  It will

15  be this one right here.

16           MR. HARVEY:  Sure.

17  BY MR. MOAK:

18      Q.    That's it.  And there was a question

19  raised about declining medical attention.

20      A.    Yes.

21      Q.    Look specifically to the second page,

22  and there you declined a flu shot.  Is that

23  correct?  That's what that is, influenza vaccine?

24           MR. HARVEY:  Can I see?  (Counsel

25       examines document.)  All right.