```
 1          IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                    SOUTHERN DIVISION

 3


 4   DAVID MARQUAR                               PLAINTIFF

 5


 6   VERSUS      CIVIL ACTION NO. 1:11-cv-00054-LG-RHW

 7

     OFFICER CHRIS ALLEN, individually
 8   and in his official capacity
     as a duly commissioned Police
 9   Officer for the City of Waveland,
     MS; POLICE CHIEF JAMES A VARNELL,
10   individually and in his official
     capacity as a duly commissioned
11   Police Officer for the City of
     Waveland, MS; DAVID GARCIA,
12   individually and in his official
     capacity as Mayor of The City of
13   Waveland, MS; CITY OF WAVELAND,
     UNKNOWN JOHN AND JANE DOES A - Z        DEFENDANTS
14

15


16
     _____

17          DEPOSITION OF CHRISTOPHER A. ALLEN
     _____
18


19   Taken at the offices of Phelps Dunbar,
     NorthOne Court, 2304 19th Street, Suite
20   300, Gulfport, Mississippi, on Monday,
     July 30, 2012, beginning at 9:21 a.m.
21

22

23

24

25
```

SIMPSON BURDINE & MIGUES  (228) 388-3130
E-mail: lmigues@sbmreporting.com

**EXHIBIT 2**

1           Hold on one second. Let him finish his
2  question and then answer. You're not doing
3  anything wrong.
4  THE WITNESS:
5           Okay. Okay.
6  MR. HELD:
7           I mean, that's just how people talk, but
8  let him finish his question and then say yes or
9  no.
10 THE WITNESS:
11          Okay.
12 MR. HELD:
13          Because you say it and he's almost done,
14 but it's going to look --
15 MR. MOAK:
16          It just makes for a clearer record.
17 THE WITNESS:
18          Okay.
19 MR. MOAK:
20      Q.  You're not under the influence of any
21 medications or alcohol that would limit your
22 testimony here today?
23      A.  No.
24      Q.  Okay. Can you give us your -- or
25 outline your education, your training, your

1  experience as it relates to law enforcement?
2       A.   Just the basic police academy in 2008
3  and several training classes after that.  I'm not
4  really sure.  I've just got a big stack of
5  certificates.
6       Q.   Okay.  And tell us about training on a
7  TASER.  Where did you receive that?
8       A.   Harrison County Sheriff's Department.
9       Q.   Okay.  Who taught that and when?
10      A.   It was Greg Federico and sometime in
11 2008.  I'm not sure of the month.
12      Q.   Okay.  Any other, any other experience?
13      A.   Other than recertifications -- other
14 than that, I don't recall.
15      Q.   Can you give us a little quick rundown
16 of your employment history in law enforcement?
17      A.   In 2006, I started in Harrison County
18 jail.  I worked there for two years.  In 2008, I
19 started in Pass Christian Police Department, and I
20 worked there for, approximately, a little over a
21 year, and then I worked with Waveland Police
22 Department.  And then once I left there, I went to
23 the Mississippi Highway Patrol Academy.  I had
24 some medical issues, and I went back to Pass
25 Christian, Mississippi.

```
 1      Q.   Is that where you are now employed?
 2      A.   No.  I'm not employed there.
 3      Q.   Okay.  What is your job now?  What do
 4 you do now?
 5      A.   I work at Power Shack.
 6      Q.   Okay.  What is that?
 7      A.   It's a vitamin and supplement warehouse
 8 in Biloxi.
 9      Q.   And how long have you worked there?
10      A.   Approximately four months.
11 MR. MOAK:
12           Okay.  Hold just one second.
13              (Off the record.)
14 MR. MOAK:
15      Q.   Just let me ask you:  Are you familiar
16 with a report called the International
17 Association -- or a group called the International
18 Association of Chiefs of Police?
19      A.   No.
20      Q.   Are you familiar with something called
21 the Police Executive Research Forum?
22      A.   No.
23      Q.   Okay.  You said that you had some
24 training in TASERs and then some recertification.
25 Could you tell us the different methods as to how
```

1  you're able to deploy a TASER on an individual?
2      A.   As in what are the steps?  I'm not
3  really clear on how you're asking the question.
4      Q.   Okay.
5  MR. HELD:
6           You can't ask him a question, but if
7  you're not clear, just ask him -- say could you
8  clarify.
9  THE WITNESS:
10          Could you clarify the question, please?
11 MR. MOAK:
12     Q.   Yeah, I got it.  Just tell me about
13 something that we call the probe method, and I'm a
14 layman in this, so I'm believing where darts, or
15 probes, are ejected from the gun; and then there's
16 a method called a stun method.  Could you describe
17 those to us?
18     A.   Actually, what it does is -- I guess you
19 would say the probe method, it ejects two probes.
20 It's got an upper and a lower, and as they come
21 out -- it's got a cartridge that attaches actually
22 to the TASER.  Whenever it deploys, it knocks two
23 doors off of it.  It has a lower and upper.  What
24 it does, when those two hit whatever you're aiming
25 it at, they connect a line in between them which

1  makes a current of electricity.  So once it's
2  deployed into whatever you're pointing it at, it
3  makes a circuit, and that's whenever it does the
4  cycle.  Other than that, it has -- it does have
5  the drive stun, which is when the cartridge is
6  taken off of it, and it's more of like a stun gun.
7       Q.   The prong method, is that the term that
8  you would use?  Would you call it prong or probe,
9  or what do you normally call it?
10      A.   It's pretty much the same thing.
11      Q.   Okay.  When you're using this probe
12 method, can you also -- let me retract that and
13 state that another way.  If you have deployed your
14 TASER with prongs into someone, can you also
15 then --
16      A.   Yes.
17      Q.   -- stun them at the same time?  Okay.
18 So you can do that?
19      A.   Yes.
20      Q.   Okay.  Do you recall when the City of
21 Waveland first issued a TASER to you?
22      A.   It was the day I started.  I don't
23 really recall what day I started there.
24      Q.   Okay.  So when you started there, you
25 didn't have to receive any additional training in

```
 1   order to get a TASER from Waveland?
 2        A.   I had gotten certified while I worked
 3   for Pass Christian.  Once I got hired on with
 4   Waveland, I did a re-cert, recertification, and
 5   then I was issued my TASER with the rest of my
 6   police equipment.
 7        Q.   Okay.  When you were with the law
 8   enforcement agency just prior to Waveland --
 9        A.   Pass Christian.
10        Q.   Uh-huh.  -- were you issued a TASER
11   there?
12        A.   Yes.
13        Q.   How long were you with them?
14        A.   Approximately a year and a half.
15        Q.   Okay.  Do you know approximately how
16   many times you may have used that TASER while with
17   Pass Christian?
18        A.   I've pulled it out a few times.  I never
19   deployed or stunned anyone with it while working
20   with Pass Christian.
21        Q.   How long did you work for Waveland P.D.?
22        A.   A little over two years.
23        Q.   Do you know how many times you would
24   have used the TASER while you were with Waveland
25   P.D.?
```

1  dangerous to wrestle with people just due to the
2  issue of them getting your firearm from you.  So
3  mainly using the TASER is a helpful tool from
4  having to get into a scuffle with someone.
5       Q.  Okay.  Let me ask you this:  Is it ever
6  appropriate under your training -- or you, as an
7  officer, do you believe it's ever appropriate to
8  tase a suspect who is in handcuffs?
9       A.  No, I don't believe it's appropriate.
10      Q.  Okay.  I'm getting there.  Let me ask
11 you -- we'll go right to Mr. Marquar's case -- can
12 you describe for me what happened on the date of
13 February the 7th, 2010 at Mr. Marquar's home?  You
14 can start from the beginning when you received the
15 call.
16      A.  Okay.  Once I received the call -- I was
17 actually at Waveland Police Department helping
18 another patrolman out, book some people in in the
19 booking room.  It was the same day as Nereids
20 parade, so we were pretty busy.  The call came out
21 as a loud music disturbance call.  I'm not sure of
22 the address.  I can't remember.  It actually came
23 out to the other patrolman which was booking the
24 people in.  I told him don't worry about it, I
25 would handle it because he was busy booking other

1  people in.  So I got in my patrol car and went
2  towards the call.
3       Once I got maybe a block or two blocks
4  away, I pulled my car over to the side of the
5  road, turned it off, rolled the windows down,
6  trying to figure out where the noise was coming
7  from.  So once I identified the area which it was
8  coming from, I drove towards it.  I still don't
9  recall the name of the street, it's been so long
10 ago.
11      Once I pulled up, I was approached by a
12 guy named Joey Dedeaux.  I've known Joey for
13 years.  So once I got out, we were talking, and
14 then I asked him whose house it was, and he -- I
15 want to say it was Keith Marquar or -- I can't
16 really remember his name.
17    Q.   Okay.
18    A.   Anyway, after speaking with Joey Dedeaux
19 for approximately two to three minutes, I asked
20 him if he can get the homeowner to figure out if
21 he could turn the music down a little bit, that we
22 had a complaint.  And he was like, yeah, no
23 problem.  So he went in there, asked the homeowner
24 if he can turn it down.  So once that was taken
25 care of, he went and turned the music down.

1              And then after his music was turned
2    down, we heard some other ruckus going on in the
3    yard next to him, which would be Mr. Marquar's
4    residence.  They had the Super Bowl broadcasting
5    over some speakers or something of that sort.  And
6    then I asked my friend again, Joey, I said, do you
7    know who lives over there?  He said, yes, it's
8    this guy's father.  I said, okay.  I said, well,
9    will you walk over there with me to, you know -- I
10   just figured it was easier that way, if I brought
11   somebody he knows.
12             So I went over there, and it was his
13   pool house.  And as soon as I approached the door,
14   I told him -- I said, look, I don't want to go in
15   there; it's too loud; I won't be able to hear my
16   radio if they're calling me.  I said, do you mind
17   going in there and find the owner and ask him if
18   he can turn it down?  He said, yeah, no problem.
19             So I can't remember if it was a glass
20   door or a screen door.  I held the door open while
21   he went in there and asked Mr. Marquar to turn it
22   down.  So I just watched them the whole time just
23   to see who the homeowner was.  At that time --
24             Can I curse?
25   MR. HELD:

```
 1            What?
 2   THE WITNESS:
 3            Can I --
 4   MR. HELD:
 5            You can say whatever you want to say.
 6   MR. MOAK:
 7       Q.   Yeah. Sure.
 8       A.   Okay.
 9       Q.   Yeah.
10       A.   At that time I seen Joey approach
11   Mr. Marquar and ask him if he would turn the music
12   down and told him that the police were there.
13   Mr. Marquar then stood up and said, get the
14   fucking police out of here; I don't know why
15   they're here, just started getting very irate.
16   Just by looking at Mr. Marquar, I can tell he was
17   intoxicated. So I looked at Joey and I said, do
18   you need me to come here; just maybe if I can calm
19   him down, just talk to him. And at that time,
20   that's whenever he turned to me, get the fuck off
21   my property; get the fuck out of here; I don't
22   know why you're here, just being very irate.
23            So due to his whole family being there,
24   friends, you know, him being irate -- and I'm
25   pretty sure everybody else there was having a good
```

1  time and had a few alcoholic beverages during the
2  day due to the parade.  So I backed out of the
3  pool house just for my safety, and I called for
4  another unit to come help me out just due to the
5  crowd and Mr. Marquar being irate.
6       So as my partner showed up, Henry
7  Bouganim, I was explaining the situation to him
8  right outside the pool house.  And as I was
9  explaining to him what was going on, Mr. Marquar
10 came outside the pool house telling us to get the
11 fuck out of his yard, that we don't need to
12 fucking be here and he wasn't turning the music
13 down and -- or the Super Bowl down.
14      Q.  Okay.
15      A.  And so at that time I said, okay,
16 Mr. Marquar, you're under arrest.  So once I told
17 Mr. Marquar he was under arrest, he told me, no,
18 he wasn't and started walking back to his pool
19 house.  So I followed him back right there, and I
20 got him right at the threshold of the door.  I
21 grabbed him by the arm, or by the wrist to, you
22 know, try to pull him out of the crowd to where,
23 you know, it wouldn't be safe for myself.  And as
24 soon as I did that, he yanked away.  He said, I'm
25 not going to fucking jail.  So I tried to grab him

```
 1   one more time, which he yanked away for the second
 2   time.  And then I said, Mr. Marquar, if you don't
 3   come here, I'm going to tase you.  So I gave him
 4   loud verbal commands.  I gave more than enough
 5   opportunity to comply.  And then that's whenever I
 6   deployed the TASER.  Mr. Marquar fell on the
 7   ground, and that's when his family and friends
 8   became very irate, threatened us with bottles and
 9   chairs and everything of that sort.
10              Well, Henry Bouganim, my partner, was
11   right behind me to make sure nobody jumped on my
12   back while I detained Mr. Marquar on the ground.
13   So once I got Mr. Marquar on his feet, we made our
14   way back out of the pool house.  And maybe about
15   halfway to where my patrol unit was and halfway in
16   his yard, Mr. Marquar fell on the ground and said
17   he couldn't walk, which he was walking just fine
18   once I stood him up.  I said, Mr. Marquar, you
19   have to get in the patrol car; you know, if not,
20   we're going to carry you, so -- well, I can't walk
21   and just still being belligerent after all of this
22   has already happened.  And then as we're still
23   walking, everybody is following us in the yard and
24   taunting us, you know, that's my uncle or my dad
25   or, like I said, just family and friends.
```

1    So once I get him to the car, by then I
2    looked up -- this is very faint.  I just looked up
3    and seen Hancock County sheriff cars, Bay St.
4    Louis sheriff cars.  Just due to crowd control,
5    there was several policemen there.  And I'm trying
6    to think.
7         Okay.  The fire department and AMR
8    refused to come to the scene just due to
9    everything going on with all the people, the
10   crowd.  So what I did is I loaded Mr. Marquar up
11   in the back of my patrol unit, and I made one or
12   two blocks to Hubbard's Hardware where I met with
13   AMR to get Mr. Marquar treatment because he said
14   he couldn't walk.  So once we're getting
15   Mr. Marquar loaded up in the ambulance, we were
16   followed down the street by the whole crowd still
17   taunting us, you know, the same thing that was
18   going on at the house.  They actually followed us
19   two blocks down the street.
20        Then once we got him loaded up and
21   secured in AMR, in the ambulance, I followed him
22   to Hancock Medical, and that's when I guess his
23   son and his daughter met us there.  By the time we
24   pulled up to the hospital, they were rolling
25   Mr. Marquar out of the ambulance.  By that time,

1   medical history.  I've never met Mr. Marquar
2   besides that night.
3       Q.   But TASER International tells you that
4   everything is fine with your tasing Marquar and
5   that there's no medical repercussions to him?
6       A.   I have never checked with TASER
7   International on my particular case.
8       Q.   But you've been able to review or know
9   of thousands of cases?
10      A.   Not cases-wise, as test-wise with TASER
11  International.
12      Q.   Do they teach you that during the
13  courses where you receive your certifications for
14  TASERs?
15      A.   I can't recall.
16      Q.   Do they teach you to shoot a person in
17  any part of the body?
18      A.   Mainly center mass, which would be your
19  chest and abdomen.
20      Q.   Do they tell you not to shoot a person
21  in certain parts of their body?
22      A.   No.  They don't mention any of that.
23      Q.   Okay.  Do they say that it's okay to
24  shoot in the head and neck region, as far as you
25  know?

```
 1        A.   I'm sure they don't say it's okay, but
 2   it's probably preferred not to.
 3        Q.   Okay.  When preferred not to, do they
 4   ask you to specifically attempt to preclude
 5   certain parts of the body when using the prong
 6   method?
 7        A.   No.
 8        Q.   Okay.  During the stun method, do they
 9   ask you to preclude certain parts of the body?
10        A.   I don't recall.
11        Q.   But during the time when you deployed
12   your TASER on David Marquar, under all of your
13   training, it was appropriate at that time to
14   deploy the TASER under those circumstances you
15   believe?
16        A.   What was the question again?
17        Q.   At the time you deployed the TASER on
18   David Marquar, you believe it was appropriate
19   under the circumstances?
20        A.   That's correct.
21        Q.   You believe it was appropriate under the
22   Waveland city police protocol to do it at that
23   time?
24        A.   That's correct.
25        Q.   Okay.
```